Moncure, P.
The plaintiff in error has been three times tried, and twice convicted, in the Hustings court of the city of Richmond, in a prosecution there impending against Mm for felony. On the first trial he was convicted and sentenced to five years’ confinement in the penitentiary. On the second trial there was a hung jury. On the third trial he was again convicted, and sentenced to two years’ confinement in the penitentiary, the shortest term prescribed by law for the offence. The case has been twice before this court, on a writ of error to the judgment of the court below. In the petition for the first writ of error, which was to the first judgment of conviction, thirteen errors were assigned in the judgment, arising upon the bills of exceptions which had been taken in the court below, and which were twenty-one in number. This court upon that writ of error reversed the said judgment, but only upon one of the said assignments of error; though there were, in the opinion of the court, some other errors in the record. And as the questions presented by the other assignments of error had been fully argued before this court, and as many of them might again arise in a future trial of the case in the court below, this court therefore considered them, *878 and expressed an opinion upon such of them as were' likely again so to arise. Sands’ case, 20 Gratt. 800. I'ke hope of the court, by this means, to prevent the necessity of bringing up the case again to this court has not been realized. It has been brought up on a writ of error to the second judgment of conviction, m the petition for which writ of error there are nine assignments of error, founded on the bills of exception takeu in the court below on the third and last trial* which are eleven in number. The questions arising on these last assignments of error and bills of exception are the questions we now have to decide, and I will proceed to consider them in the order in which the said bills-of exception were taken.
I. The first of- these assignments of error arising on-the first of these bills of exceptions is, that the court erred in overruling the motion of the accused to quash the writ of venire facias which had been issued for his-trial and the return thereon, which are set out in the said first bill of exceptions.
The said venire facias bears daté the 7th day of August 1871, is governed by, and seems to be in conformity with, the act approved March 29, 1871* which went into-operation from and after the first day of July 1871, entitled=“ An act; to amend and re-enact sections 1, 4, 5, 9, 14* 25 and 26 of chapter 208 of the Code of Virginia* as to juries in criminal cases and change of venue.” Acts of Assembly 1870-71, ch. 262, p. 357. That act-seems also to be in conformity with the constitution. The venire facias therefore is free from any good ground of objection. Was it executed in a legal manner ? Or were the proceedings under it, or any of them, illegal ?
Ifcis objected that the- list-furnished the officer by the judge of the Hustings court contained only the names ofi twenty-four persons ; and as the writ'commanded the officer.to summon twenty-four-persons to be-taken from the -list, ho was therefore required to summon all on the *879 list. "Whereas the list should have contained the names of more than twenty-four persons, so that the officer might have made a selection from the persons named in the list. It is ai-gued that if the list need contain the names of only twenty-four persons, the judge may thus, in effect, select the jury, which would be palpably improper.
It would be better, no doubt, for the judge to include the names of more than twenty-four persons in the list required to be furnished by section four of the said act. Because twenty-four persons named in the list are required to be summoned by the officer, it might very well happen that some of the persons} named in the list would be absent from the county, or could not be found, and therefore the officer would be unable to comply with the mandate of the writ.
But it is not perceived that the execution of the writ would be void, though the names of only twenty-four persons were included in the list, and though some of the persons therein named could not be found, and therefore could not be summoned ; at least, if as many as sixteen of those persons were found and summoned. Under the old law, which required the officer to summon under a venire facias twenty-four qualified persons. from the body of his county or corporation at large, for the trial of a case of felony, there could have been no reason for making a return of not found, and therefore no such return was ever made. But under the present law, there may often be reason for such a return, unless the number of persons named in the list be large, and it would be very unreasonable to invalidate the proceeding, at least if as many as sixteen persons] were summoned. And, indeed, if as many as sixteen persons were not summoned on the first venire facias, where is the difficulty in having other qualified jurors summoned in the manner aforesaid, until a panel of sixteen jurors-free from exception should be completed ? To bekure,. *880 the ninth section of the act aforesaid does not literally embrace such a case, but it does in spirit and effect. "What the accused is entitled to have is, a panel of sixteen juroi’S, free from exception, from which a jury for the trial of his case may be selected. The law has provided certain means whereby to secure to him this right, and the use of those means may be continued until that right is attained. Suppose twenty-four persons be summoned by the officer, and all of them attend, and all of them be free from exception, how are sixteen of them to be chosen to constitute the panel ? The accused cannot make the choice. He has no right to be tried by any sixteen of them he pleases. The officer can call any sixteen of them he pleases, and put them upon the panel, and then the accused may peremptorily challenge any four of them he pleases, and the remaining twelve will constitute the jury for the trial of the case. Suppose that sixteen only of twenty-four persons named in a list are summoned by the officer, the others not being found; and that all of these sixteen persons are free from exception; why'may they not constitute the panel ? Why should any more be summoned, when the officer may at last pnt those same sixteen on the panel % Why, when more than sixteen have been summoned, and the others named in the list are returned “ not found,” may not the court proceed to ascertain whether, of those summoned and in attendance, there be as many as sixteen free from exception, and if so, to constitute a jury nut of that number, or if not, to make up and complete the panel in the manner aforesaid ?
Hor is it perceived that there is any force in the objection that the judge, by naming only twenty-four persons in the list, in effect selects the jury. He certainly does not select the jury: at most he only selects the twenty-four, from sixteen of whom, free from exception, if so many there be, a jury may be constituted for the trial of the case. But what reasonable objection can *881 there be to that ? Is he not as competent to make such ■a selection as a ministerial officer of the court ? Is he under any constitutional or legal disability to make such a selection ? Does not the law expressly empower him to make such a selection in requiring him to furnish the officer with a list of the persons to be summoned, without prescribing the number of persons whose names are to be included in the list ? But it is said that the law contemplated that more than twenty-four should be named in the list, as it directs twenty-four to be taken therefrom, which implies that some would be left behind. No doubt it did contemplate that more would generally be included in the list, and it would be better, as I have already said, to include more. But I do not think the law requires that more should, of necessity, be included. If more, how many more? 'Would one, two, or twenty more be sufficient ?
I think, therefore, that although twenty-four persons only were named in the list, and only nineteen of them were summoned, and of the nineteen summoned only eighteen were in attendance, the court did not err in overruling the motion to quash the said writ or the return thereof, and directing the clerk to proceed to call the jurors summoned under the said writ.
But even if there had been any error in this respect, I do not think tk'e accused would have been prejudiced thereby, and it would have been cured by the subsequent proceedings in the case, and especially the proceeding by which a jury was constituted for the trial of the ease, supposing that proceeding to be itself free from error, a question which will be presently considered.
II. The next assignment of error, arising on the second bill of exceptions is, that the court erred in overruling the motion of the accused to endeavor further to obtain a jury from the city of Richmond, instead of sending for jurors to any other county or corporation.
On the second trial of the case, after an abortive effort *882 to obtain a jury from the said city, only two jurors having been obtained from the persons summoned under thevenire facias which had been issued for the purpose of that trial, the court said that in its judgment it would be proper then to issue a writ of venire facias for other persons, to make up the said jury, to some other county or corporation than the said city ; to which course the accused, by counsel, expressed objection, and a desire that another writ should be issued to summon persons from the city for a jury, before sending elsewhere. And thereupon, at the instance of the attorney for the Commonwealth, sundry witnesses were examined, after hearing whom, the court being of opinion that it would be very inconvenient, if not impossible, to get a jury in this-case in the city of Eichmond, sent to the city of Alexandria for persons to complete the jury. To which action of the court the accused excepted, and this matter constituted the second bill of exceptions taken on the second trial.
On the third and last trial of the case, after the proceedings had taken place which are set out in the first bill of exceptions taken on that trial, the court proceeded with the call of the persons who had been summoned under the writ of venire facias referred to in said first bill,, of whom eighteen were present, being all who were summoned under said writ ■ except one", and being severally examined on their voir dire as to whether they had formed and expressed opinions in reference to this case, they were all found ^ to have formed and expressed such opinions as disqualified them from serving as jurors upon the trial of the accused. The court thereupon said that in its judgment it would be proper then to pursue the same course that was adopted on the second trial of the case, and send for persons to form a jury to some other county or corporation than this city. To which course the accused, by counsel, pursuing the same course 'as before, objected, until further efforts were made to *883 obtain a jury from this city. Thereupon it was agreed by the Commonwealth’s attorney and the accused, by counsel, and assented to by the court, that the testimony heard upon this point at the second trial should be considered as heard and received as testimony on the same point on the third trial. And the said testimony, as contained in the said second bill of exceptions taken on the second trial, was made a part of the second bill of exceptions taken on the third trial, as if repeated at large therein» And it further appeared by the registration list of voters in this city that there were at least 11,000 of such voters; that the number of colored voters was at least 5,000, and that no colored voter had ever been summoned as a venireman upon any of the trials of this case, or of the case of George Chahoon. And the sergeant of the city and his deputy (who had been examined on the same subject on the second trial), having been again examined, stated that it was still their opinion that it would be inconvenient, if not impossible, to get an intelligent and impartial jury in this case in the city of Richmond. Thereupon the accused renewed his motion, that further effort should be made to obtain qualified jurors from this city for his trial, before sending elsewhere for that purpose, and insisted that the vicinage had not been exhausted, and that the court, under the present Constitution and laws, and under the facts now appearing, had no power to send elsewhere for jurors, certainly not at this stage of the case; and the court being of the opinion that it would be inconvenient, if not impossible, to obtain an intelligent and impartial jury in the city of Richmond, the cases of Chahoon and Sands having been the subject of almost universal discussion and commentary among all classes and conditions of people here, refused to endeavor further to obtain a jury from the city of Richmond, and ordered writs of venire facias to. the towns of Staunton and Charlottesville. To which opinion and decision of the court the accused excepted ; *884 and this matter constitutes the subject of the second bill exceptions taken on the third trial.
That the court below did not err in this opinion and decision is sufficiently shown by what was said in Chaboon’s case, recently decided by this court, and not yet reported, unless”the act concerning juries in criminal cases, approved March 29, 1871, as aforesaid, alters the case. That act, jby its terms, went into operation from and after the first day of July 1871, and it carried into effect, iffiregard to criminal cases, the third section of the third article of the constitution, which provides that “all persons entitled to vote and hold office, and none others, shall be eligible to sit as jurors.” Independently of the effect of that act, there was greater reason for sending abroad for a jury for the last trial of the accused than for the last trial of Chahoon, which took place previously to that of the accused.
But, as by the operation of that act, which went into effect after the last trial of Chahoon, and before the last trial of the accused, a large addition was made to the class of persons in the city of Bichmond “ eligible to sit as jurors,” the question is whether that fact altered the case and made it improper to send abroad for persons to constitute a jury for the last trial of the accused.
If these additional persons, who were thus made eligible to sit as jurors, had been brought from abroad and settled down in Bichmond at the time the act aforesaid went into effect, it would have been pi’oper to have resorted to this new source before sending abroad for a jury.
But these additional persons had been residents of Bichmond during the progress of all the trial which had taken place in these cases, and their minds were as much made up on the subject as the minds of those of the same locality who had been previously eligible to sit as jurors. It is not strange, therefore,- that the sergeant and deputy sergeant, upon their re-examination after *885 this new element of jury material had been added to the stock, stated “ that it was still their opinion that it would be inconvenient, if not impossible, to get an intelligent' and impartial jury in this casein the city of Richmond,” and that the court below should have been of the same opinion, and should accordingly have sent abroad for a jury. Certainly I cannot say that the said court erred in that respect.
III. The next assignment of error, arising on the third bill of exceptions, is, that the court erred in overruling the motion of the accused for a change of venue, made after the court had determined to send abroad for persons to constitute a jury as aforesaid, and before any writs of venire facias had been issued under that determination.
I am of opinion that there is no error in the judgment in this respect, and that on this branch of the case it is sufficient 'to refer to what is said on the same subject in the recent case of Chahoon, before referred to.
IV. The next assignment of error, arising on the fifth bill of exceptions, is that the court erred in overruling the objection of the accused to the competency of J. B. Sherer as a juror, and directing him to be placed upon the panel for the trial of the accused.
The question intended to be presented by this assignment of error, and the bill of exceptions on which it is founded is, whether a person laboring under the disability created by the 14th amendment of the constitution of the United States, can be eligible to sit as a juror under the 3d section of the 3d article of the constitution of the State, which provides that “ all persons entitled to vote and hold office, and none others, shall be eligible to sit as-jurors.” Conceding, what is by no means certain, that it sufficiently appears from the said bill of exceptions, that the juror, J. B. Sherer, was in fact [laboring under the said disability, does the aforesaid provision' of the constitution of the State apply to *886 the case ? I think not. I think that provision applies onty to “persons entitled to vote and hold office” under the State constitution, and not to persons so entitled under the constitution of the United States. The words of the provision were used in reference to other portions of the State constitution, as it was adopted by its framers. It then contained the provisions therein designated as clause 4th, section 1, article 3, and section 7, article 3, which were afterwards stricken out by the popular vote taken on the question as to the adoption of the constitution with or without the said provisions. By'these provisions, similar disabilities to those created by the 14th amendment of the constitution of the United States, were adopted and engrafted on the State constitution, and were applied equally to voting and holding office, so that those and only those who were entitled to vote were entitled to hold office; and then the 3d section of article 3 declared that “all persons entitled to vote and hold office, and none others, shall be eligible to sit as jurors:” That is, “all'persons entitled to vote and hold office under this constitution,” &c. These disabilities under the State constitution wTere entirely independent of the disabilities under the 14th amendment, and the 3d section aforesaid had reference to the former and not to the latter. The provisions aforesaid pointed out the mode whereby the disabilities thereby created might have been removed; that is, by a separate vote in each case, of three-fifths of both houses of the Legislature. The 14th amendment aforesaid points out a mode whereby the disabilities thereby created may be removed ; that is, by a vote of two-thirds of each house of Congress. The removal of the disabilities in the one case would not have operated a removal of the disabilities in the other. When, therefore, the provisions aforesaid were stricken out of the State constitution, the said 3d section was not thereby made to refer to the disabilities created by the said 14th amend- *887 merit, but continued afterwards to refer, as it had before referred, only to the State constitution.
I am therefore of opinion that there is no error in the judgment of the court below in regard to the competency of J. B. Sherer as a juror.
Y. The next assignment of error, arising on the sixth ■and seventh bills of exceptions is, that the court erred in overruling the objection of the accused to a question propounded by the attorney for the Commonwealth to the witness John W. Cole, and to any answer thereto, and' in allowing the said question to be asked, and the witness to answer it, as stated in the said sixth bill of exceptions ; and also in overruling the motion of the accused to exclude from the jury, and to direct them to disregard so much of the evidence of said Cole as was in answer- to the question propounded to him as aforesaid, as stated in the said seventh bill of exceptions.
The question here referred to was : “Bid you* have any conversation with R.. B. Sanxay concerning the bond for seven thousand dollars, which has just been shown you, in the year 1866 ; if so, state the conversation ?” To which question, and any answer thereto, the prisoner by his counsel objected, in the absence of any statement • by the Commonwealth’s attorney, that he expected to follow the question up by proof, either that the prisoner was present at the said conversation, or that, if absent, he was afterwards informed of the said conversation and its purport; and in this connection, it was admitted that the said R. B. Sanxay died in the year 1868 : and the attorney for the Commonwealth stating that he expected to introduce further evidence tending to prove that the said R. B. Sanxay, curator, .and the aeeused his counsel, afterwards conjointly uttered and employed the said forged bond as true, knowing it to be forged ; the court overruled the said objection of the prisoner and allowed the said question to be put and the witness to answer it; to which opinion of *888 the court the prisoner excepted: and this was the subject of the said sixth bill of exceptions. .
The witness Cole then said, in answer to the said question, that “ there was a conversation in the latter part of 1866 between him and Sanxay about the bond. "Witness had collected rents for Sanxay from this property (Haunstein’s real estate.) Sanxay had had some-difficulty with his tenants, and requested witness at the end -of the quarter to call for the .bills again. Witness, met Sanxay on the street about the end of the quarter, and asked him if he had'his bills ready. . He told witness he did not; that he did not know whether he would give him any more bills to collect; that there had been an account or note, witness forgets which, brought against the estate, and that it was a damned forgery, and that he did not intend to pay it. Witness thinks he must have said * note,’ as he said’it was a damned forgery. He told witness, however, he would see him again about it, and witness saw him afterwards, and he-told- him he would not want him to collect any more rents ; that he had made enquiries about this note, and found it was all correct, and that he would have no more to do with the estate as curator “ his meaning being, as witness understood, that the payment of the note-would consume the whole estate.? This last remark •was made by witness on his cross-examination ; in the course of which he also said that it was about the 1st of October 1866 that he met Sanxay in the street, when the latter pronounced the note a damned forgery as aforesaid, and witness thought it was during the same'month, October, that he saw Sanxay again, and he said “he-had enquired into it (the note), and. found the note all correct, ‘and that he would have no more to do with the-estate as curator.” After this answer was given by the-witness, Cole, a great deal of other evidence was given by that and other witnesses, and then the prisoner moved the court to exclude from the jury, and to direct them to *889 disregard, so much, of the evidence of the said Cole “ as purports to detail the two conversations between Richard D. Sanxay and said Cole concerning the note, bond or ' claim against the said Haunstein’s estate, which conversations are detailed in the testimony of. said Cole as aforesaid, upon the ground, particularly, that the same were not held in the presence of the prisoner, and that it does not appear that he was ever informed of the fact, that such conversations had taken place, or of their purport, and that the same are not competent for any purpose in this prosecution.” But the court overruled the said motion, and permitted the said- evidence to remain before the jury, and to be considered by them in the trial of the prisoner ; to which decision of the court the prisoner-excepted ; and this was the subject in part of the said seventh bill of exceptions.
The evidence. introduced in behalf of the Commonwealth, and set out in the said bills of exception, tended to show that Solomon Haunstein, a foreigner, died in the city of Richmond in the year 1861, intestate, and without heirs, having lived in the city several years before his death, and accumulated quite a large estate, consisting partly of money and other personal property, but chiefly of houses and lots, in or near the city ; that Richard D. Sanxay was curator of the said Haunstein’s estate, having been appointed and qualified as such shortly after and during the same year of Haunstein’s death, and having thereafter had the care and management of his estate; that a writing purporting to be the writing obligatory of said Haunstein, for the sum of seven thousand dollars, payable-on demand to John W. Thompson or oi’der, and an endorsement thereon purporting to be the endorsement of said Thompson, being the writing and endorsement in the indictment mentioned, were forged ; that sometime in the year 1866, or early in the year 1867, a conspiracy was formed by George Chahoon, the prisoner, Johnson H. Sands, the said curator, R. D. *890 Sanxay, and his son Richard S. Sanxay, to convert the egtate .of said Haunstein to their own use ; that the plan they devised to effect that object, was to utter and employ as-true the said forged bond, which they knew to be forged, and by proceedings at law and in equity to subject the said estate to the payment of the said forged bond ; and then to divide the fruits of the crime among themselves ; that in pursuance of the said-criminal purpose, Chahoon, who it seems had come to the city of Richmond to live in 1.866, professing to act as attorney at law for William Gleason, the pretended assignee of said forged bond, instituted an action at law thereon in the County court of Henrico, on the 28th day of January 1867, and at the same time handed to the clerk of said court the declaration in the case and the said forged bond ; that said Chahoon, when he went to the clerk’s office to bring said action, handed to the clerk a letter of introduction to' him from the prisoner Sands, and he, the said Chahoon, was not seen at the clerk’s office nor at the courthouse of said county again until after judgment was obtained in said action ; that judgment by default w7as entered in said action for the amount of said forged bond, with interest and costs, on the 11th day of March 1867, less than two months after the action was brought; that the curator Sanxay was at the clerk’s office pending the action, examined the papers therein, and told the clerk to mark the name of the prisoner as his counsel in the action; that afterwards, and on the day on which the office judgment in the action was confirmed, but before such confirmation, and before the office judgment docket was called, there was a meeting in the clerk’s office between the said curator and the prisoner, and a pretended consultation took place between them in the presence and hearing of the clerk, about putting in a defence to the said action, which there was then full time enough to do ; that they had the papers' in the action, to wit: the said declaration -and bond in their hands, when Sands told Sanxay the *891 only way he could defeat the suit was to put in the plea of non est factum, and advised and urged him to do so ; •that Sanxay, who had been looking at the said paper in his hand, said he could not swear that this was not the writing of Solomon Haunstein, that he could not swear that it was not Haunstein’s signature, and therefore that he could not put in that plea; that Sands said to Sanxay that other pleas might be dilatory, but this was the only plea that could defeat the action, and that if he could not put in that plea, he had no further use for counsel, or he could do him no good; they then went out together, and no plea was put in, and the office judgment was confirmed; that shortly thereafter, to wit: on the 29th day of April 1867, a cause iii chancery was docketed by consent in the Circuit court of Henrico county, in the name of William Gleason, assignee of John W. Thompson, plaintiff, against Richard X>. Sanxay, curator of the estate of Solomon Haunstein, deceased, defendant, the plaintiff having on the same day filed his bill ‘and the defendant his answer; the object of which cause was to obtain a decree for the sale of the real estate of Haunstein for the payment of the said forged bond: The bill is very brief, states the judgment obtained at law as aforesaid, of which a copy is exhibited, and that the plaintiff was informed by said curator that there was no personal estate; charges that the rents of said estate (meaning the real estate) would nothing like pay said debt in five years, that the whole property, &o., was not sufficient for that purpose, if sold, and that Haunstein died without leaving heirs; and prays that Sanxay, the curator, might be made defendant to the bill, that so much of said property as might be necessary should be sold to pay said debt, that all proper parties might be made defendants to the bill, that all proper accounts might be taken, and for general relief. It is signed, “Wm. Gleason, assignee of John W. Thompson, by George Chahoon, his counsel.” The said evidence fur *892 ther tends to-show that the said hill is principally in said Chahoon’s handwriting, though there are several interlineations in Sands’ handwriting, some or all of which appear to be material. The answer of the curator, after making some preliminary statements as to his qualification and proceedings as curator, and as to Haunstein’s having died intestate and without heirs, further states, “ that he paid all the debts which he thought were due by said estate, and knew not of this debt due the plaintiff till after the war, when he gave as a reason for not applying for it sooner, through his counsel, that it was because the condition of the country prevented- him from doing so and then, after stating that he hid settled 'his aceouuts as curator, and was ready to render a further account and pay the balance, if any, which might be found due by him, he further states “ that the rents from said property (meaning the real estate) would not pay the plaintiff’s debt in twenty years ; that said estate, if sold, would hardly do so ; • that he cannot make any objection to the sale asked for by the plaintiff', as the estate is liable for his claim, and the longer it stands there will be less chance for liquidating the whole of it'; that he is satisfied this is the only outstanding claim against said estate, and he thinks it would be better for all .parties for the estate to be sold, without waiting for the stay law to be removed, and for this claim to be paid out of the proceeds.” The said evidence further tends to show that this answer was signed by the defendant Sanxay, and was in the handwriting of Sands. On the same day on which this bill and answer were filed, and the cause was docketed by consent, to wit: on the 29th day of April 1867, the cause came on to be heard hy like consent, when the court decreed that the said Richard D. Sanxay, who was appointed a special .commissioner for the purpose, should, after paying, on account of said alleged debt due by the said judgment, whatever might be due fronfihim as curator aforesaid, sell all .or so much of the *893 said real estate as might be necessary to settle the balance of the said debt, at public auction on the premises, after advertising the time, place, and terms of sale in one of - the newspapers published in the city of Richmond for ten days, upon the following terms : one-third cash, one-third on a credit of three -months, and the balance on a credit of six months, taking for said deferred payments negotiable notes with good endorsers, including interest, and retaining the title until the further order of the court, unless the purchaser or purchasers prefer to pay all cash; in which case the said special commissioner was' authorized to receive the same and make such purchaser a deed at once for the property so purchased, and the said special commissioner was authorized and directed to apply said notes and cash arising from said sales in payment of said debt to said William Gleason, assignee of John W. Thompson, or to George Chahoon, his attorney, in full, of the same, and take his receipt therefor, and file it with the papers in the case, and report all his proceedings therein to the court. The said Sanxay is then required to give bond as special commissioner, and to settle a further accouut as curator before a commissioner of the court. • .
On the 29th of October 1867, the cause came on again to be heard, by consent of parties, by their attorneys, upon the reports of commissioner Evans and commissioner Sanxay, under the former decree, which reports were on that day filed; on consideration whereof, the court approved and confirmed said reports ; and it appearing that nothing further remained to be done in the cause, it was ordered to be removed from the docket. The report of special commissioner Sanxay states, that he sold the said property on the 16th day of May 1867, in the manner and on the terms prescribed by the decree of the 29th of April 1867, after advertising the sale as therein directed, at which sale Mary J. Wilkinson became the purchaser of one lot, at the price of $800; *894 Richard S. Sanxay of another, at the price of $1,060;, ¥m. I). Porter, of two others, at the price of $1,275; -and J. H. Sands of two others, at the price of $1,200 ; which embraced all of the real estate; that all of the purchasers preferred to settle and get their deeds at once for the property so purchased, which was done accordingly; and that after paying the expenses of sale, &c., and the balance arising therefrom of $4,079.88, as well as the sum of $917.56, due by the curator, was paid over to George Chahoon, attorney for ¥m. Gleason, his receipt for which was therewith returned. That receipt is in these words : “June 15th, 1867. Received of R. D. Sanxay, special commissioner, the sum of forty-nine' hundred and ninety-six x9o4ir dollars, in part satisfaction and discharge of the judgment obtained in Henrico County court at March term 1867, in favor of ¥m. Gleason, assignee of John W. Thompson, against Richard D. Sanxay, curator of the estate of Samuel Haunstein, dec’d. (Signed,) Geo. Chahoon, att’y for ¥m. Gleason, assignee of John W. Thompson.” The. said evidence further tended to show, that the body of the said receipt of Chahoon, and both of the decrees rendered in the suit, were in the handwriting of Sands, and that “ Chahoon never appeared in the case in any shape or form;” that R. S. Sanxay was, in fact, the purchaser of the lot which was cried out to Mary J. Wilkinson, who was his mother-in-law, and afterwards sold it to Sands; that R. D. Sanxay, the curator, made an arrangement to have Porter’s two lots conveyedjfo his son, the said R. S. Sanxay; so that he, R. S. Sanxay, finally got three of the lots, and Sands the other three; and that Chahoon and R. S. Sanxay paid money towards feeing the escheator to stop his proceedings to have the said property escheated, but that Sands refused to pay anything towards that object.
There is a good deal of other evidence embodied in the bills of exceptions, which I have not stated in detail, *895 having stated only so much as I thought might be material to the proper understanding of the question I am now considering. Perhaps I have stated more than was necessary; but the question is one which the learned counsel for the plaintiff in error seems, to deem the most important in the case, and which he argued with great earnestness and ingenuity. That question, be it remembered, is as to the admissibility of the evidence of Cole in regard to the declarations of K. D. Sanxay, which the counsel contends are inadmissible for any purpose in this prosecution. Is that so ? •
The charge against the accused in this case is, that he uttered and attempted to employ as true, a forged instrument, knowing it to be forged; and that he accomplished the criminal act by means of a conspiracy between himself and others. In such a case it is well settled, that the conspiracy being proved, the acts and declarations of any of the conspirators, in furtherance of the object of the conspiracy, are admissible evidence against each and all of them, though such acts and declarations were not done and said in the presence of all. And they are admissible even against a conspirator who did not accede to the conspiracy until after they were done and said. Each conspirator is the criminal agent of every other, and when he accedes to the conspiracy he sanctions what may have been previously done or said by the others, or any of them, in furtherance o'f the common object. Such admissibility is not confined to a case in which the prosecution is for the conspiracy itself, but extends to a case like this, in which the prosecution is for the very crime committed in pursuance of the conspiracy. And it does not matter whether the prosecution be jointly against all, or severally against each, or one of the perpetators.
blow, in order to the admissibility of such evidence on the ground just stated, two things are certainly necessary : 1st, that the persons whose acts or declarations *896 are sought to he made evidence, was, at the time of dohig or making them, himself a conspirator; and, 2dly, ' that they were done or said in furtherance of the object of the conspiracy.
That R. D. Sanxay, the curator of Haunstein’s estate, was, at some time or other, one of the conspirators, if any conspiracy there was, the evidence strongly tends to prove. Indeed, it is difficult, if not impossible, to conceive, supposing the evidence in the case to be true, how any judgment could have been recovered against him in the action at law upon the forged bond, without his concurrence, consent or connivance. The least degree of fidelity on his part to the trust reposed in him by law as curator of the estate he represented, would have ensured the defeat of that action. The plea of non est factum would certainly have defeated it. It was his duty to have put in that plea. He could easily have done so ; and he must have known' it. The scene at the clerk’s office before referred to, must have been all a sham, gotten up. for effect, and to give some color of excuse for his palpable and criminal neglect of duty in letting a judgment go by default against him for a pretended debt, large enough -in amount to sweep the whole estate he represented. The same scene, it appears from the evidence of a witness introduced by the accused, was substantially repeated by the parties, immediately after leaving the clerk’s office, and in the presence of the said witness, whom they mej outside of the office. "Why was this repetition ? Of course I make these remarks on. the assumption that the evidence, and what it tends to prove, is true.
Sanxay, the -curator, then was, according to the evidence, one of the conspirators at least as early as the meeting aforesaid at the clerk’s office, on the day ■on which the office judgment was confirmed. But was he not also, as early as the time of making the declarations to the witness, Cole, before referred to, or at least *897 on the second occasion ? I think he certainly was; and that those declarations prove the fact; of course, supposing the testimony of Cole to be true. The two occasions on which these declarations were made, both occurred in the same month of October 1866 ; there being but a short interval between them. But they were widely different in their nature. The first was made very soon after the curator first heard of a claim against the estate of Haunstein on the forged bond, and then he naturally and indignantly denounced it as a forgery, in the strongest language he could use, and declared that he would not-pay it. He told witness, however, he would see him again about it. And witness saw him after-wards; during the same month, when he told witness he would not want him to collect any more rents; “ that he had made enquiries about this note, and found it was all correct, and that he would have no more to do with the estate as curator. His meaning being, as witness understood, that the payment of the note would consume the whole estate.”
How, when the first of these two declarations was made, it is evident that the curator, Sanxay, had not entered into the supposed conspiracy, and certainly that. declaration, standing by itself, was not in furtherance of the object of said conspiracy. That declaration, therefore, had nothing further been said by him, would not have been relevant or admissible evidence in this case. But something further was said by him. He told witness on that occasion that he would see him again about it; and witness saw him afterwards, when he told witness “ he would not want him to collect any more rents ; that he had made enquiries about this note, and found that it was all correct, and that he would have no more to do with the estate as curator.” This last declaration is, I think, both relevant and admissible. It tends strongly to show, that in the short interval of time between the two conversations with the witness, Cole, an *898 extraordinary change had been wrought in the mind of the curator, Sanxay ; that he had deserted his impreg- " nahle camp and gone over to that of the enemy, and joined them in the assault they were about to make upon that estate which it was his sworn duty to defend. In what way this mysterious change was brought about, by whose agency, and what were the terms of capitulation, we do not know and probably never will. "We only know how the curator acted afterwards, and in concert with whom, and with what result of action, all of which tends strongly to show that between the two conversations with Cole, Sanxay became one of the conspirators to defraud the estate of Haunstein and convert it all to their own use. The last declaration to Cole is admissible evidence, both because it tends to prove the conspiracy, and also because it was an act in furtherance of the object of the conspiracy. It was an important act in aid of the conspiracy to induce a belief in the public mind that the forged bond was genuine, or at least believed to be so by the curator, and to afford a plausible pretext to the curator for not defending the estate he represented against the heavy claim asserted against it. Having pronounced the paper on which that claim was founded a “ damned forgery,” it was peculiarly necessary for him, in furtherance of the object of the conspiracy, to counteract the 'impression produced by that denunciation ; and he therefore told the person in whose presence the denunciation was made, “that he had made enquiries about this note, and found it was all con’ect.” This last deelararation, therefore, was clearly admissible evidence ; and so also was the first, which was inseparably connected with the last. They were closely connected in point of time, subject and person, and were parts, and almost one and the same part, of the res gestae. Cole and Sanxay were conferring about a matter of business that Cole was doing for Sanxay in reference to the estate of Haunstein. Cole was collector of the rents of the estate, and called *899 on Sanxay for the accounts of rent for the last quarter. Then it was that the denunciation aforesaid was made by Sanxay. “ He told witness, however, he would see him again about itand he did accordingly see him again, when the last declaration aforesaid was made. How the last declaration is connected with the first in its very nature, and cannot he well understood without reference to the first. It matters not that they were made on different days. They might have been made on the same day, and after the interval of only a few moments, though in different interviews. But they would have been none the more parts and parcels of the same transaction. They did occur in the same month, which is all sufficient for the purpose of the connection. I think, therefore, that both declarations are relevant and admissible evidence.
But the first is admissible upon another ground. The-Commonwealth’s theory of this case is, that certain persons conspired to utter and employ as true a forged bond,, knowing it to be forged ; and that they effected the criminal object in view by means of such conspiracy. The guilty knowledge of the forgery by the conspirators was a necessary element of their guilt, without proof of which, there could be no conviction. Ho one could be a conspirator without having such guilty knowledge. The conspiracy being proved, then the acts of the conspirators in furtherance of the conspiracy become evidence against each other, as before stated. But the conspiracy must be proved, either positively or circumstantially, and ‘£ guilty knowledge” is a necessary part of that proof. How how is this guilty knowledge of the several conspirators to be proved ? Certainly it is not necessary to prove that at one and the same time, and by one and the same means, the guilty knowledge was imparted to them all. If that were necessary, there could hardly ever be any conviction in such a case. But it is not necessary. It is only necessary to show that each of the conspirators had such guilty knowledge, no matter how, where. *900 or when he acquired it. The proof of it may therefore, and generally does, apply to the parties severally, and not jointly, as if the prosecution were against him only to whom the proof refers. In proof of Sanxay’s guilty knowledge in this case, then, it certainly was admissible to show that when the forged bond was first demanded of him, he emphatically denounced it as a forgery. This was not evidence against the other parties that the bond was a forgery, nor of their guilty knowledge. But it was evidence of the guilty knowledge of Sanxay, and so it was admissible in this case for the purpose of showing such guilty knowledge. If it was admissible for any purpose in the case, the court certainly did not err in refusing to exclude it. The motion to exclude it was, upon the ground that it was “ not competent for any purpose in this pi’osecution.” If the accused had moved for an instruction to the jury that this evidence was admissible only to prove the guilty knowledge of Sanxay, the question might have been different. But no such motion was made.
I am therefore of opinion that the Circuit court did not- err in overruling the objection made to the question propounded to the witness, Cole, nor in overruling the motion to exclude the answer to that question as evideuce in this case, as mentioned in the sixth and seventh bills of exception.
YI. The next assignment of error is, that the court erred in overruling the motion of the prisoner to exclude from the jury and direct them to disregard so much of the testimony of Charles H. Page as details a conversation he says he heard between the prisoner, George Chahoon, and Thomas B. Bowden, upon the ground that it does not sufficiently appear that the said conversation had any reference to the subject of the charge against the' prisoner, as mentioned in the seventh bill of exceptions.
This conversation, standing by itself, would seem to be very vague and insignificant, and to be entitled to *901 little or no weight against the prisoner, and was perhaps entitled to little weight, even in connection with the other circumstances of the case, as it was very vague and uncertain in its terms. Still, I cannot say that it was entitled to no weight in that connection, and that it was therefore not competent evidence to go before the jury. The conversation occurred in the latter part of 1866 or first part of 1867, about, or just before, the time the action at law was brought upon the alleged forged bond of Haunstein. It occurred between Chahoon, Sands and Bowden, and was about some money matters. During the conversation, the remark was made by Sands, “that there was seven or eight thousand dollars to he made out of the case. Bowden, who seemed to be leading in the conversation, seemed by his language to indicate that it was too difficult to undertake; that there would be trouble about it; and Sands seemed to be pressing the case, saying there would be 'no trouble.” The prisoner introduced no evidence to show, and did not pretend, so far as appears from the record, that this conversation referred to any other case than the claim for which the said action was brought. Of course I assume the truth of the testimony of the witness in expressing an opinion as to its competency. Whether it was true or not, and what weight, if any, should be given to the conversation to which it refers, as evidence in this case, were questions for the jury.
I am therefore of opinion that there is no error in the judgment of the Circuit court in this respect.
VII. The next assignment of error arises on the eighth bill of exceptions, and is that the court erred in overruling the objection of the prisouer to a question propounded by the attorney for the Commonwealth to Alexander 11» Holladay, a member of the bar of the city of Richmond, and a witness introduced by the prisouer, and to any answer to the said question, as set forth in the said bill of exceptions.
*902 The said witness, after testifying in regard to the character of the prisoner, said “ that he sees no impropriety in counsel co-operating in getting the real estate sold under a judgment, where there is no personalty. Ho defence could have been made in the chancery suit; saw nothing on examination of the bill to excite suspicion ; knows nothing about the Haunstein forgery ;. if he had been a lawyer, would have • been certain to have been present in a case of magnitude when the office judgment was called ; got information of a material character from a gentleman, which he cannot detail; would not have made a mere fictitious defence,.if the client could have made no defence on the merit.” And the witness being then under examination by the attorney for the Commonwealth, the said attorney propounded to him the following question, which, at the instance of the prisoner’s counsel, was reduced to writing, to wit:
“ Suppose you were counsel for the defence in a case where judgment had been allowed to go by default, and had afterwards assisted the plaintiff’s counsel in getting a decree on that judgment for the sale of your client’s property, and the property had been sold, and you had gotten possession of a part of it, and you had then known that the counsel for the plaintiff was paying fees to an officer of the State to stop his proceedings to escheat the property, would you have remained silent about it ?”
To which question and to any answer to it the prisoner objected. But the court overruled the objection, and allowed the question to be put to the witness ; assigning as a reason that the witness had “ been asked, on his examiuation-in-chief, without objection, .numerous questions as to what be would or would not have done, and what he would or would not have considered proper, as a lawyer, in certain supposed cases, mostly based upon the action of the accused, as shown by the testimony in the case against the accused which testimony is set forth in the bills of exceptions taken in the *903 cause. ” The witness, in his reply, stated, “ that in the case supposed by the question, he would have exposed and denounced the whole proceeding and all concerned' in it.”
The court, by the reason assigned for overruling the objection to this question, seems to admit, and rightly so, that the question, as an original one, would have been improper; but seems to suppose that it was admissible to countervail questions of the like kind and alike improper, propounded' to the witness on his examination-in-chief, without objection.
To this it was answered by the counsel for the accused; in argument before this court: 1st, that the questions propounded to the witness in his examination-in-chief were not improper, being questions propounded to the witness as an expert; and, 2d, that even if they were improper, they were not objected to ; and that the admission of improper evidence on the one side, which is not objected to, is no sufficient reason for the admission •of improper evidence on the other side, which is objected to.
In regard to the first of these two answers, I think that the questions propounded to the witness on his examination-in-chief, or some of them at least, were alike improper with the question propounded to him on his cross-examination. In regard to the second answer, it is true as a general proposition ; as the authorities referred to by the learned counsel seem fully to show. 'They are Wilkinson v. Jett, 7 Leigh, 115; Walkup v. Pratt, 5 Har. & John. R. 51; and Stringer, &c. v. Lessee of Young, 3 Peters U. S. R. 320, 337. In the last case, Chief Justice Marshall, in delivering the opinion of the court, said : “ The testimony offered by the defendant was unquestionably irrelevant.” “ But the plaintiffs in error insist that they had a right to introduce this testimony in order to rebut other equally irrelevant testimony which had been offered by the plaintiffs in *904 ejectment. This testimony was undoubtedly irrelevant, and, had it been opposed, could not have been properly admitted. Had the defendant moved the court to instruct the jury that it must be .utterly disregarded, that it must not be considered by them as testimony, and this instruction had been refused, the refusal to give it would have been error. The defendant, however, has not taken this course ; but has chosen to repel the testimony by other, evidence which was clearly inadmissible. Whether a ease may exist in which improper testimony may be calculated to make such an impression on the jury that no instruction given by the judge can efface it, and whether, in such a case, testimony not otherwise admissible may be introduced, which is strictly and directly calculated to disprove it, are questions on which this court does not mean to indicate any ,opinion. It is unnecessary, because the testimony rejected by the court is not of this character.”
Whether the questions thus referred to by the Chief Justice have ever been decided or not, I do not know. Hor will I express any opinion upon them in this case, •or attempt to show that the question propounded to the witness, Holladay, in his cross-examination as aforesaid, would have been admissible on the ground suggested by the chief justice, if it had been propounded to him in his examinatiou-in-chief. We know very well, that questions are admissible on a cross-examination, which would not be admissible on an examination-in-chief. And the able counsel for the plaintiff* in error admitted in his argument, that the attorney for the Commonwealth might have fairly crossrexamined the witness upon the points to which he testified in chief, though the said counsel contended that it was not admissible to put to the witness a question which called for his opinion as a man, upon a certain supposed state of facts. How let us see how this is.
A witness, who was very truly stated by the counsel *905 to have been “ for many years a lawyer of distinction and high position,” was introduced by the prisoner, and testified on his examination-in-chief “ that he is very well acquainted with the prisoner ; practiced with him. That so far as he knows, he (prisoner) was considered a gentleman of character. Never heard of anything against him before he was a candidate for the judgeship of Henrico County court. Never heard of anything against his character until then. That he sees no impropriety in counsel co-operating in getting the real estate sold under a judgment where there is no personalty. No defence could have been made in the chancery suit; saw nothing on examination of. the bill to excite suspicion,” &c. &e.
Now here was an attempt made by the prisoner to-throw the great weight of this distinguished lawyer’s opinion in the scale of the defence, by proving by him that certain acts of the prisoner in co-operating in the proceedings to get the real estate of Haunstein sold, which acts had been proved and relied on by the Commonwealth as links in the chain of testimony against the prisoner, were in fact' innocent acts, and perfectly consistent with the prisoner’s innocence of the offence charged against him. And so indeed they might have been the acts of an innocent man ; and if he had not conspired with others to utter and employ as true a forged paper, knowing it to be forged, against the said estate, we would readily have accepted this as the true view of his conduct. But when we view thesfe acts in connection with the other links in the chain of the testimony against the prisoner, we are led to the conclusion that they were not induced by the innocent motive of affording assistance in doing a lawful thing, but were parts and parcels of means which were used for the perpetration of the crime charged against him. The object of the question propounded to the witness in his cross-examination, which has already been set out in full in this opinion, was to present the acts aforesaid in connec *906 tion with one or two of the other links in the chain of the testimony against the prisoner, and thus to show that while those acts standing alone might be viewed as innocent acts, yet they might be viewed as criminal acts when taken in connection with those other links in the chain of the testimony, supposing them to be true. I am therefore of opinion that the question, being put in the cross-examination of the witness and for the purpose aforesaid, was admissible.
We have high authority for this opinion in the decision of the court of King’s Bench, made in 1844, in the case of Greville v. Chapman, 5 Ad. & El. 731, N. S., 48 Eng. C. L. R. There, a libel consisted in imputing to the plaintiff, that he acted dishonorably in withdrawing a horse which had been entered for a race ; and he proved by a witness that the rules of the jockey club, of which he was a member,' permitted owners to withdraw their horses before the race was run ; it was held that the witness, on cross-examination, might be asked whether such conduct as he had described as lawful under these rules, would not be regarded by him as dishonorable. Lord Denman, chief justice, in delivering the opinion of the court, said of the question : “We think this perfectly free from objection, and necessary for arriving at the real meaning of the evidence given.”
But even if I doubted the admissibility of the question, and inclined to think it inadmissible, I do not think it can be said that the prisoner was injured by admitting it, and I would be unwilling to reverse the judgment and remand the cause for a new trial on that ground. That irrelevant evidence is admitted on a trial of the case is not, necessarily, a ground for reversing the judgment rendered in the case. The party complaining must have been injured by the admission of the evidence. A court cannot be required to give an instruction upon an abstract question of law, even though the law be truly expounded in the instruction asked for; and if the court refuse to *907 give it, such refusal will not be error; though if the court give it, that will not be error for which the judgment can be reversed, because it is not error to the prejudice of the party against whom the instruction was given. In this case the witness, as might well have been expected, stated in reply to the question, that in the case thereby supposed, “he would have exposed and denounced the whole proceeding, and all concerned in it.” And so undoubtedly he would. All honorable and right-minded men would, doubtless, have given the same answer to the same question. It could not have had the remotest influence in inducing the jury to convict an innocent man. Suppose the witness had been asked: “Do you consider perjury a sin which will be punished hereafter ?” or, “If you were on the jury, and the guilt of the prisoner were proved to your entire satisfaction, would you find him guilty ?” certainly these would have been irrelevant and improper questions, and ought not to have been. permitted to be asked or answered. But suppose they had been permitted to be asked and answered, could it be said that this was an error to the prejudice of the prisoner, for which the judgment against him ought to be reversed ? I regard the reversal of a judgment in such a case as this, in which there have already been three trials and two convictions, and the case has once before been in this court, as a great public evil, unless justice requires it, and I would be unwilling to reverse the judgment in this case, unless it plainly appeared that there was error in it, and that such an error worked an injury to the prisoner. I do not think that either appears, in regard to the assignment of error I am now considering ; and I am therefore of opinion that the Hustings court did not err, and certainly not to the injury of the prisoner, in overruling his objection to the question propounded to the witness, Holladay, and to any answer thereto as aforesaid.
YIII. The next assignment of error arises on the *908 tenth bill of exceptions, and presents in a different form the question presented by the fourth assignment of error, to wit: as to the competency of J. B. Sherer, one óf the jury. Having already expressed my views fully upon that question, it follows from them that I think there is no error in the judgment in this respect.
IX. The next and last assignment of error arises on the eleventh bill of exceptions, and presents the question, whether the Hustings court had power to empanel the grand jury which found the bill of indictment against the prisoner. This question was fully considered and decided in Chahoon’s case, recently decided by this court, in which it was held that the said Hustings court had such power ; and the same must accordingly be held in this case.
"Upon the whole, I am of opinion that the judgment ought to be affirmed.
Christian and Staples, Js.,
were of opinion that the testimony of Cole, as to his conversations with Sanxay, and the question put to Holladay and his answer, were illegal. On the other questions in- the cause, they concurred in.the opinion of Moncure, P.
Anderson, J., concurred in the opinion of Moncure, P.
Judgment aeeirmed.